UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

12 CV 3835



| | |
|---|---|
| MARYLEBONE PCC LIMITED – ROSE 2 FUND, on behalf of itself and all similarly situated persons, | CLASS ACTION COMPLAINT |
| Plaintiffs, | |
| vs. | JURY TRIAL DEMANDED |
| MILLENNIUM GLOBAL INVESTMENTS LTD., MILLENNIUM ASSET MANAGEMENT LTD., MICHAEL R. BALBOA, GLOBEOP FINANCIAL SERVICES LTD., BCP SECURITIES LLC and XYZ CORP., | |
| Defendants. | |

Plaintiff Marylebone PCC Limited – Rose 2 Fund, by and through its attorneys, files this class action complaint against defendants Millennium Global Investments Ltd., Millennium Asset Management Ltd., Michael R. Balboa, GlobeOp Financial Services Ltd., BCP Securities LLC. and XYZ Corp. (collectively, "Defendants") on behalf of itself and other similarly situated persons and allege as follows on information and belief from public sources:

## I.      SUMMARY OF THE CASE

1.      This is a class action on behalf of investors in the Millennium Global Emerging Credit Fund L.P. and Millennium Global Emerging Fund Ltd. (the "Funds") to recover approximately $800 million of losses sustained as a direct result of Defendants' fraudulent and/or grossly negligent misrepresentations to investors and knowing and/or grossly negligent breaches of fiduciary duties owed to the funds and to the investors. Defendants are the former managers of the Funds and entities involved in the valuation and pricing of the Funds' assets.

1

2.      This case involves a fraudulent scheme by the Funds' manager and his co-conspirators to intentionally overvalue two illiquid and sizeable securities positions. Beginning in mid-2007, the Funds' portfolio manager, Michael Balboa ("Balboa") began to artificially inflate the mark-to-market quotes ("marks") for one (and later two) of the Funds' largest securities, in order to inflate the Funds' reported monthly returns and overall net asset value ("NAV"). Balboa was assisted by Gilles De Charsonville ("De Charsonville") at BCP Securities LLC ("BCP"), a purportedly independent broker who provided marks for the securities. Effectively, through the false marks, Balboa made the Funds' value and returns appear higher and smoother than they actually were, so that he could raise additional capital.

3.      In October 2007, the Funds' independent valuation agent, GlobeOp Financial Services, Ltd. ("GlobeOp") flagged the huge variances between Balboa's marks (and those from De Charsonville) and the quotes GlobeOp obtained from Bloomberg. At first, GlobeOp refused to release Fund valuations with Balboa's pricing. GlobeOp then accepted Balboa's explanation that he had local sources for his marks, without verifying those sources or Balboa's past pricing. GlobeOp also requested marks from a second broker.

4.      Thereafter, from January and October 2008, Balboa enlisted a second co-conspirator in his scheme. He directed GlobeOp for marks for these two large securities positions from Charsonville and another broker at an unknown U.K.-based broker-dealer firm ("XYZ Corp."). GlobeOp would contact the two co-conspirators for marks, who would then contact Balboa for marks which they gave back to GlobeOp. In reality, Balboa fabricated and dictated the false marks for these securities to deliberately mislead

investors. Without the knowing assistance of his two co-conspirators, he could not have perpetrated his fraud.

5.      Despite the knowledge it had in October 2007 that Balboa's marks for these two positions were questionable, GlobeOp accepted the phony marks without sufficient or adequate verification that they were real marks or that Balboa's co-conspirators who were referred to GlobeOp by him, actually traded in the two securities. GlobeOp failed to properly verify the legitimacy and authenticity of this false pricing, or perform sufficient due diligence on the pricing of investments which differed dramatically from the actual market. The incredible inflation alone during the period of the fraud should have caused GlobeOp to question the validity of the marks.

6.      These false valuations (and their source) represented a material misrepresentation that was never disclosed to investors. Nowhere in the offering memoranda, marketing materials, monthly newsletters, or the 2007 audited financial statements, did the Funds or their managers reveal that the valuations came directly from Balboa, or that the Funds' valuations were not reflective of legitimate, honest and independent mark-to-market quotations.

7.      Balboa, with the knowing and substantial assistance of De Charsonville and XYZ Corp., caused the Funds to progressively overstate their NAV each month by millions of dollars. By August 2008, Balboa's false pricing had overvalued or artificially inflated the Funds' value by approximately $163 million. Effectively, the false profits reported negated losses on other positions, so that the Funds appeared to be performing and holding up well when most other credit markets were in turmoil or collapsing.

8.      Through the false valuations, Balboa portrayed the Funds to investors as healthy and not impacted by the global credit crisis that was also causing most credit-based hedge funds to collapse or report losses.  Between January 2008 and mid-October 2008, the Funds were able to attract roughly $410 million in new investments and deter close to $230 million in eligible redemptions.

9.      Had Plaintiffs known that the Funds' manager was falsifying the valuations to maintain performance, they would have refrained from investing in the Funds or immediately sought to withdraw their investments from the Funds. Yet Defendants failed to provide Plaintiffs with the information they needed in order to determine if their investment in the Funds met their objectives and risk tolerance during a time of crisis in the global credit markets.

10.      In December 2011, Balboa was arrested and he has been charged by the United States' Attorney with criminal securities fraud, wire fraud and conspiracy to commit securities and wire fraud.  The case is pending before this Court, *U.S.A. v. Michael Balboa*, Criminal Docket No. 11-3038 (S.D.N.Y.) (PAC).    Separately, the Securities and Exchange Commission ("SEC") also brought a civil action against Balboa, De Charsonville and the other unidentified individual who assisted in the fraud which is pending before this court, *SEC v. Michael R. Balboa and Gilles T. De Charsonville*, Civil Docket No. 11-8731 (S.D.N.Y.) (PAC).

11.      Defendants' actions have damaged Plaintiffs and Class Members. Defendants sold Plaintiffs and other investors investments in the Funds based on false and misleading valuations. Defendants also misled investors in the Funds into forebearing from redeeming or liquidating their investments based on declines in the

Fund's assets and values by hiding the losses and declines with false profits and inflated values. As a result, Plaintiffs suffered a loss of their entire investment when the healthy Funds were suddenly wiped out by margin calls from their creditors.

## II.    SUBJECT MATTER JURISDICTION AND VENUE

12.    This Court has original jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because at least one member of the class is a citizen of a state different from at least one defendant, and the aggregate amount in controversy exceeds $5,000,000.00, and less than two-thirds of all Class members reside in the State of New York. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (b) because a substantial part of the Defendants' conduct giving rise to the causes of actions occurred within this District.

## III.    RELEVANT NON-PARTIES

14.    Millennium Global Emerging Credit Master Fund, Ltd. (the "Master Fund"), and the Millennium Global Emerging Credit Fund, Ltd. (the "Offshore Feeder Fund") were Bermuda-exempted companies and the Millennium Global Emerging Credit Fund, L.P. (the "Domestic Feeder Fund") was a Delaware limited partnership (collectively referred to below as the "Millennium Global Emerging Credit Funds" or "Funds") with a general partner and primary office located in New York, New York.

15.     The Funds were a group of funds not registered with the SEC that were organized in a master-feeder structured so that investors invested in the Domestic and Offshore Feeder Funds which, in turn, owned the holdings of the Master Fund.

16.     On October 16, 2008, the Master Fund and Offshore Feeder Fund petitioned the Supreme Court of Bermuda for voluntary liquidation and were placed under the control of three court-appointed joint provisional liquidators. On September 19, 2011, the U.S. Bankruptcy Court for the Southern District of New York entered an order recognizing these Bermuda liquidation proceedings as foreign main proceedings pursuant to Chapter 15 of the U.S. Bankruptcy laws.

## IV.    PARTIES

### A.    <u>Plaintiffs</u>

17.     Plaintiff Marylebone PCC Limited – Rose 2 Fund ("Marylebone") is an entity organized and domiciled in Guernsey. Marylebone purchased limited partnership interests in the Offshore Feeder Fund and suffered damages as a result of Defendants' misconduct described herein.

### B.    <u>Defendants</u>

18.     Defendant Millennium Global Investments, Ltd. ("MGIL") is a privately-owned investment management firm based in London, United Kingdom.  Throughout the relevant time period, MGIL had a primary office located in New York, New York. Founded in 1994, MGIL purports to specialize in alternative investment strategies for institutional investors.  MGIL is an investment adviser registered with the SEC and National Futures Association ("NFA"), and conducts business in the United States. During the relevant time period, MGIL managed approximately $15 billion in assets

6

through a variety of funds. Pursuant to a November 14, 2006 Investment Management Agreement and a September 24, 2007 Amendment Agreement, MGIL was the Investment Manager of the Funds. As Investment Manager, MGIL was responsible for the Funds' investment decisions and valuations of its non-exchange traded securities holdings.

19.     Defendant Millennium Asset Management, Ltd. ("MAML") is, and at all relevant times was, a privately-owned investment management firm based in St. Peter Port, Guernsey. Founded in 1997 and an affiliate of MGIL, MAML provided certain services, such as reconciliation, NAV sign-off, back-office operations and marketing services. MAML is registered as a member of the NFA and conducts business in the United States. Pursuant to a November 14, 2006 Investment Management Agreement and a September 24, 2007 Amendment Agreement, MAML was the Manager of the Fund, responsible for the Funds' administration.

20.     Defendant Michael Balboa ("Balboa") is a resident of the United States. Between December 2006 and October 2008, Balboa had his residence in New York, and was an employee and Managing Director of MGIL, and MGIL's designated Portfolio Manager for the Funds. As the Portfolio Manager, Balboa was primarily responsible for the management of the Funds, authored the first draft of the Funds' offering memoranda, drafted or commented on the Funds' marketing materials, and directed their distribution to investors by the Funds and MGIL, and was the final decision maker on the Funds' investments. Balboa is currently the Co-Founder and Managing Partner of ARAM Global, an asset management consulting firm with offices in New York.

21.    Defendant BCP Securities, LLC ("BCP") is, and at all relevant times was, an SEC-registered broker-dealer headquartered in Greenwich, Connecticut. Since July 2003, BCP has employed De Charsonville who has been a partner and FINRA-registered foreign associate residing in Madrid, Spain. De Charsonville engaged in the conspiracy with Balboa to defraud the Funds' investors.

22.    Defendant GlobeOp Financial Services, Ltd. is, and at all relevant times was, a financial services firm headquartered in New York, New York. GlobeOp advertises itself as providing, among other things, independent valuation services to pension funds, insurance companies, asset managers and hedge funds. Pursuant to a December 2006 Valuation Agent Services Agreement with MGIL, GlobeOp was at all times the Funds' independent valuation agent, responsible for providing independent valuations of the Funds' holdings.

23.    Defendant XYZ Corp. ("XYZ Corp.") is, at all relevant times was, a U.K.-based brokerage firm that employed a broker who, like De Charsonville, was engaged in the same conspiracy with Balboa to defraud the Funds' investors. In its Civil Complaint, the SEC indentified the existence of this individual who was involved in the conspiracy and his firm but did not disclose the names. Plaintiffs intend to amend the Complaint at such time as the identity becomes known and will substitute in the name of the proper defendant at such time.

## V.    SUBSTANTIVE ALLEGATIONS

## A.    BACKGROUND

### 1. Balboa's Prior Employment and Hiring at Millennium

24.    Prior to joining MGIL, Balboa worked for the former London-based

investment advisory firm, Rainbow Advisory Services, Ltd. ("Rainbow"), from 2003 to 2006. Rainbow managed two emerging markets hedge funds and was owned and controlled by another individual, who was its CEO and founder (the "CEO").

25.     The CEO, and not Balboa, made the investment decisions for Rainbow's funds. Balboa's responsibilities at Rainbow consisted of research, trade execution and marketing. Accordingly, in the Rainbow funds' October 2005 due diligence questionnaire responses ("DDQ") for prospective investors (which Balboa drafted and executed), Balboa identified the CEO as the funds' "Chief Portfolio Manager" and described the CEO as solely responsible for the funds' "portfolio management."

26.     In or around September 2006, Balboa applied for a position at MGIL and, in his application materials, described his role at Rainbow as "Fund Manager" where he "[m]anaged over $200 million." MGIL ultimately hired Balboa to serve as a portfolio manager for its newly-created fund, the Millennium Global Emerging Credit Fund. Shortly afterwards, MGIL, at times at Balboa's direction, began distributing pitchbooks to prospective investors for the Funds that described Balboa's previous position at Rainbow as "Portfolio Manager" and also highlighted the Rainbow funds' impressive monthly returns from 2003 to 2006.

27.     Balboa repeated these false and misleading statements, telling at least one potential investor of the Funds that he had been the "portfolio manager" at Rainbow and had been responsible for its trading decisions.

## 2.  Overview of the Fund

28.     In September 2006, the Funds were organized for the purpose of investing primarily in sovereign and corporate debt instruments from emerging markets.

The Funds were initially run through a single Bermuda-based entity, but in October 2007 evolved into a master-feeder structure: the Bermuda-based fund was the master fund, with the Offshore Feeder Fund and the Domestic Feeder Fund incorporated in Bermuda and Delaware, respectively. Millennium Global Management, LLC, a Delaware limited liability company headquartered in Manhattan, was named as the general partner of the Domestic Feeder Fund.

29.     MGIL and MAML were at all times the appointed "Investment Manager" and "Manager," respectively, for the Funds. Balboa, a managing director at MGIL, served at all times as the Funds' portfolio manager and, as described in the Fund's offering memoranda, DDQs and newsletters, the final decision-maker for the Funds' investment decisions. While the offering memoranda and certain other marketing materials were distributed by and attributed to the Funds, certain pitchbooks distributed to prospective investors bore the imprint of and were distributed by MGIL.

30.     The Funds began operation in December 2006 and ultimately raised approximately $800 million in investor capital primarily from institutional and fund-of-funds investors throughout the world, including approximately $100 million from U.S. investors. As part of the Funds' marketing efforts, Balboa met with, and offered shares in the Funds to, prospective investors worldwide, including in Manhattan and Miami. In addition to solicitation meetings with Balboa held in the United States, the Funds' investors also received offering memoranda, subscription agreements and marketing materials, and wired their subscription funds to the Funds' bank account in Manhattan in order to consummate their investments.

31.     Investors were solicited with the Funds' offering memorandum which states that the investment objective is to "achieve capital appreciation, consistent with relative stability of principal." The Funds' strategy was to invest in 15-20 core "shorter dated income situations" and "longer dated optionality investments", selected through "a top down approach to macroeconomic research and bottom-up cash flow-based fundamental credit analyses for individual issuers".

32.     The offering memoranda also sets forth maximum limits of 30% of investments exposed to issuers from any one country below investment-grade, 20% of investments exposed to any one issuer, and maximum leverage of 200%.

### 3.  Representations to Investors About The Funds' Pricing

33.     In addition to retaining other well-known third-party providers to assist with its operational needs, Balboa arranged for GlobeOp to serve as the Funds' independent "valuation agent". In this capacity, GlobeOp was described in the Funds' offering memoranda as being "responsible for the calculation of the [Fund's] Net Asset Value" and that, "[w]herever practicable, [would] use independent sources" for this purpose. In addition, the Funds' various DDQs touted GlobeOp's role as the Funds' "independent valuation agent" and, to this end, emphasized that "[t]here are no assets valued in house," that "[m]anager marks are not used to price the portfolio," and that "GlobeOp values 100% of the [Fund's] portfolio."

34.     The Funds also represented in its offering memoranda that its valuation methodology sought to establish "fair value" for illiquid and non-exchange traded investments through such factors as cost price and recent transaction prices, and that its

financial statements would be reviewed on an annual basis by its outside auditor, Deloitte.

35.    Although Balboa drafted the first version of the Funds' offering memorandum and reviewed and edited drafts of it and the Funds' DDQs—which described GlobeOp's supposedly independent valuation methodology—Balboa did not at any time correct or amend these disclosures to reveal the true nature of his role in supplying valuations for certain of the Funds' portfolio holdings.

36.    At or near the end of every month, GlobeOp would determine the month-end valuations for each of the Funds' securities holdings, and use them to calculate the Funds' month-end total net asset value, or NAV, the NAV per share and the monthly performance.  This information was then communicated to investors in the Funds' monthly newsletters and used to compute its asset-based and performance-based management fees. Although Balboa reviewed these newsletters and drafted the "Commentary" sections of each, at no time did he correct or amend the newsletters to disclose that the NAVs were inflated by the falsified valuations he supplied to GlobeOp through De Charsonville and XYZ Corp.

**4.  Impact of False Valuation Reports**

37.    The GlobeOp valuations allowed the Funds to report in its monthly newsletters and pitchbooks that it had achieved positive returns in 19 out of 21 months between December 2006 and August 2008, over 25% annualized returns and, in August 2008, that its NAV had reached $844.3 million. Balboa also touted the Funds' monthly performance and NAV figures orally on investor conference calls and meetings with investors and prospective investors.

38.     In addition to the Funds final month-end valuations generated by GlobeOp, Balboa would provide MGIL with his mid-month and month-end performance projections for the Funds, incorporating the fabricated marks which MGIL would pass on by email to the Funds' investors.

39.     The Funds paid management and performance fees to MGIL that were based on GlobeOp's monthly NAV calculations. The management fee was 0.167% (2% annual) of the Fund's month-end overall NAV and paid monthly; the performance fee was 20% of any NAV per share price appreciation, on a high-water mark basis, that was determined and paid each quarter.

40.     From December 2006 to September 2008, MGIL received approximately $19.1 million in management and performance fees from the Funds. Over this same time period, as compensation for the investment advice he provided to the Funds, and in recognition of the purported returns he was producing and the growth of assets under management, Balboa received from MGIL a 40% share of the fees it collected from the Funds (minus certain expenses), which amounted to roughly $6.5 million in total.

**B.     THE DEFENDANTS' FRAUDULENT SCHEME**

**1.     The Nigerian and Uruguayan Warrants**

41.     Among the Funds' sovereign debt holdings were Nigerian payment adjustment warrants and Uruguayan value recovery rights (together, the "Warrants"). These Warrants, which were created as part of the "Brady Bond" restructuring of emerging market bank loans in the early 1990s, were illiquid and traded on an over-the-counter basis. The Funds purchased 23,500 of the Nigerian Warrants between January and March 2007 for an average price of $244 per warrant and a total price of $5.7

million. The Funds purchased 9.5 million of the Uruguayan Warrants in March 2007 at a price of $0.016 per warrant for a total cost of $152,000.

42.    Between November 2007 and September 2008, the Nigerian Warrants never traded above $237. As for the Uruguayan Warrants, there were no trades or published quotes for this security during this same time period. Moreover, because the payment rights for the Uruguayan Warrants are contingent upon a commodities index reaching a strike-price that has never been met, these Warrants have never made a payment to investors and, as a result, have at all times been virtually worthless.

## 2.    Manipulation of the Monthly Valuations

43.    The Funds' offering memoranda, various DDQs and audited financials described the valuation methodology and procedures GlobeOp would employ to produce its valuations and to calculate the Funds' NAV. For the Funds' illiquid and non-exchange traded securities, such as the Warrants, GlobeOp was to obtain mark-to-market quotes (i.e., marks) on a monthly basis from outside brokers. The same materials also stated that, "whenever possible," GlobeOp would use marks from more than one source for each non-exchange traded security for valuation purposes. GlobeOp thus relied on brokers to provide it with marks that reflected the brokers' realistic views of the prices the securities would command in arms-length transactions between market participants, based on their experience executing trades or making markets in those securities.

44.    Beginning in mid-2007, Balboa began to artificially inflate the mark-to-market quotes for the Nigerian Warrants. Balboa was assisted by De Charsonville who provided marks for the securities. Effectively, through the false marks for the Nigerian

Warrants, Balboa made the Funds' value and returns appear higher and smoother, so that he could raise additional capital from investors. This occurred at or about the same time that the global credit crisis was causing large volatility and turmoil to hedge funds engaged in credit strategies.

45.    In October 2007, after several months of increases in the Nigerian Warrants marks, GlobeOp flagged the huge variances between Balboa's marks (and those from De Charsonville) and the quotes which GlobeOp obtained from Bloomberg. At first, GlobeOp refused to release the Funds' valuations with Balboa's pricing. GlobeOp then accepted Balboa's explanation that he had local sources for his marks, without verifying those sources or Balboa's past pricing. GlobeOp also requested marks from a second broker.

46.    Thereafter, from January and October 2008, Balboa enlisted a second co-conspirator in his scheme. He directed GlobeOp to get marks for the Nigerian and Uruguayan Warrants from Charsonville and another broker at an unknown U.K.-based broker-dealer firm ("XYZ Corp."). GlobeOp would contact these two co-conspirators for marks, who would then contact Balboa for marks which they gave back to GlobeOp.

47.    In reality, Balboa fabricated and dictated the false marks for these securities to deliberately mislead investors. Balboa recommended De Charsonville and the broker at XYZ Corp. to GlobeOp, even though he knew that neither one regularly traded or made markets in either of these securities. Without the knowing assistance of his two co-conspirators, he could not have perpetrated his fraud.

Despite the knowledge it had in October 2007 that Balboa's marks for these two positions were highly suspicious, GlobeOp accepted the phony marks without sufficient

or adequate verification that they were real marks or that Balboa's co-conspirators, who were referred to GlobeOp by him, actually traded in the two securities. GlobeOp failed to properly verify the legitimacy and authenticity of this false pricing, or perform sufficient due diligence on the pricing of investments which differed dramatically from the actual market. The incredible inflation alone during the period of the fraud should have caused GlobeOp to question the validity of the marks.

48.    De Charsonville provided GlobeOp with purported month-end marks from at least January 2008 to October 2008 for the Nigerian Warrants and he provided marks for the Uruguayan Warrants for six months in 2008. XYZ Corp. purported to provide GlobeOp with marks from January 2008 through April 2008 for the Nigerian Warrants and in April and May 2008 for the Uruguayan Warrants.

49.    Of the 30 purportedly "independent" marks for the Warrants provided to GlobeOp by De Charsonville and XYZ Corp. between January 2008 and October 2008, at least 17 of them came directly from Balboa. On many of these occasions, the scheme was perpetrated in the following sequence: (i) GlobeOp would email De Charsonville or XYZ Corp. asking for the marks for the Warrants (as well as other securities) for the preceding month; (ii) De Charsonville or XYZ Corp. would then email Balboa either requesting a price from him or asking about his availability to "mark to market"; (iii) Balboa would either send a reply email or call them with his desired prices for the securities; and (iv) the two brokers would then reply to GlobeOp's email with the prices they had obtained from Balboa.

50.    The following chart details the 17 occasions on which Balboa—either by email or by telephone—conveyed to De Charsonville and/or XYZ Corp. the marks they

were to provide GlobeOp as purportedly independent market quotes. In each instance, and shortly after receiving the marks from Balboa, De Charsonville and XYZ Corp. passed them on as their own to GlobeOp.

| DATE | BROKER | SECURITY | PRICE |
|---|---|---|---|
| 1/11/2008 | Broker A | Nigerian Warrants | $525 |
| 3/4/2008 | Broker A | Nigerian Warrants | $515-525 |
| 5/5/2008 | De Charsonville | Nigerian Warrants | $1,300-1,500 |
| 5/14/2008 | De Charsonville | Nigerian Warrants | $1,300-1,500 |
| 6/3/2008 | De Charsonville | Nigerian Warrants | $1,300-1,500 |
| 6/4/2008 | De Charsonville | Uruguayan Warrants | $2.25-2.75 |
| 6/16/2008 | De Charsonville | Uruguayan Warrants | $3.30-3.80 |
| 7/1/2008 | De Charsonville | Nigerian Warrants | $1,300-1,500 |

| DATE | BROKER | SECURITY | PRICE |
|---|---|---|---|
| 7/1/2008 | De Charsonville | Uruguayan Warrants | $3.50-3.90 |
| 7/16/2008 | De Charsonville | Nigerian Warrants | $2,240-2,440 |
| 8/6/2008 | De Charsonville | Nigerian Warrants | $2,650-3,680 |
| 8/18/2008 | De Charsonville | Uruguayan Warrants | $9.25-9.75 |
| 9/2/2008 | De Charsonville | Nigerian Warrants | $2,750-3,200 |
| 9/2/2008 | De Charsonville | Uruguayan Warrants | $8.50-9.50 |
| 9/16/2008 | De Charsonville | Nigerian Warrants | $3,275-3,875 |
| 10/1/2008 | De Charsonville | Nigerian Warrants | $3,000-4,000 |
| 10/1/2008 | De Charsonville | Uruguayan Warrants | $8.00-9.00 |

51.     Despite responsibility for obtaining independent marks, GlobeOp failed to determine that De Charsonville and XYZ Corp. were providing marks based solely on the numbers Balboa had given them. Defendants also failed to disclose to investors in the Funds that the marks came from Balboa, the Portfolio Manager.

52.     GlobeOp knew from the incident in October 2007 that Balboa's marks were questionable. GlobeOp had access to Bloomberg and should have detected that the marks for the Warrants were increasingly disconnected from the market, and

enormously inflated. GlobeOp failed to ensure that the two co-conspirators actually transacted in the Warrants.

53.     In addition to passing on Balboa's phony marks, on at least three occasions, May 14, 2008, July 16, 2008 and August 18, 2008, De Charsonville provided GlobeOp with justifications that were scripted by Balboa for some of the larger price increases for the Warrants.  On these occasions, GlobeOp failed to detect that there was no justification for the increased marks or that the increased marks and the justifications had been supplied by Balboa.  Moreover, on at least three other occasions, June 16, 2008, October 8, 2008 and October 29, 2008, GlobeOp relied on false indications from De Charsonville that the basis for his marks came from his "local sources", and did not sufficiently verify the "local sources".

54.     Balboa knew that GlobeOp relied on the false marks from De Charsonville and XYZ Corp. as its independent sources, and he did not inform GlobeOp that he was the real source of the marks. GlobeOp made no diligent effort other than to contact the sources provided by Balboa, namely De Charsonville and XYZ Corp., to verify the marks that were given.

55.     As part of the Funds' monthly valuation process, GlobeOp would run its asset valuations, and the underlying marks it received, by Balboa for review and approval. As a result, Balboa knew that GlobeOp was using the fictitious marks provided by him through De Charsonville and XYZ Corp. to calculate the Funds' NAV. This practice by GlobeOp allowed Balboa to freely coordinate and plan his fraud.

56.     Balboa's false marks bore no relation to real market prices, and he made no effort to tie the marks to real market prices.  In fact, on at least two occasions, Balboa

ignored what he knew about recent market activity in setting the valuations he provided De Charsonville for GlobeOp. GlobeOp also failed to detect the recent market activity.

57.     With respect to the Nigerian Warrants, on September 1, 2008, Balboa learned from a broker at Exotix Ltd. that the broker had just sold 40,000 of the security at "around $215" and that he would sell Balboa any of Exotix's client's remaining 45,000 holdings of the security at or around the same price. Balboa declined the offer, but on the next day, he instructed De Charsonville over the phone to provide GlobeOp with a mark of $2,750-3,200 for the Nigerian Warrants—a value 15 times greater than the price he had just been quoted. Then, just two weeks later, and without seeing any higher quotes, on September 16, 2008, Balboa caused a further increase in the Funds' valuation of the Nigerian Warrants by directing De Charsonville to provide a revised August 2008 month-end mark of $3,275-3,875.  GlobeOp's incorporation of that mark into its final August month-end NAV calculation resulted in the Funds' recording of an additional $3.76 million in inflated profits.  Had GlobeOp performed its duties properly, it should have detected the 1500% inflation in price of the Nigerian Warrants beyond recent transactions.

58.     Balboa also ignored the actual market value for the Uruguayan Warrants. On September 12, 2008, Balboa had the Funds purchase 48 million of Uruguayan Warrants at a price of $0.035 a piece. The newly-acquired Uruguayan Warrants were called the "VRR-A" Warrants; the Warrants already held by the Funds were denoted as the "VRR-B" Warrants.  Because the new VRR-A Warrants bore the same terms and were part of the same issue as the Funds' existing VRR-B Uruguayan Warrants, their fair market values should have been virtually identical. Nevertheless, on October 1,

19

2008, Balboa instructed De Charsonville to provide GlobeOp with a September 2008 month-end mark of $8.50-9.50 for the VRR-B Uruguayan Warrants, approximately 300 times greater than the purchase price he had just paid for the virtually identical VRR-A Warrants a little more than two weeks earlier. Had GlobeOp performed its duties properly, it should have detected the huge price disparity between the VRR-A and VRR-A prices.

**3.  False Warrant Values Hide Fund Losses**

59.    Between April and July 2008, when the Funds' valuations for the Warrants collectively increased thirteen-fold by $157 million (while the rest of the Funds' portfolio experienced close to $200 million in losses), Balboa used the Warrants' seeming appreciation to conceal losses sustained in the Funds' other holdings. The following chart illustrates how Balboa inflated the Warrants' valuation to avoid reporting losses or to pare down substantial losses sustained by the Funds:

| Month | Change in Nigeria Warrants Valuation ($) | Change in Uruguay Warrants Valuation ($) | Fund's Overall Reported Growth | Fund's Actual Overall Growth (without NIG or UGY gains) |
|---|---|---|---|---|
| April 2008 | +20,625,416 | +23,750 | -29,483,898 (-4.28%) | -50,109,314 (-7.44%) |
| May 2008 | 0 | +33,368,750 | +7,190,196 (+0.91%) | -26,178,554 (-3.51%) |
| June 2008 | +22,442,500 | +1,425,000 | +1,389,809 (+0.17%) | -22,477.691 (-3.04%) |
| July 2008 | +25,262,500 | +55,100,000 | -25,923,985 (-3.16%) | -106,286,485 (-14.53%) |

60.     Notably, during the same four-month time period, one or both of the Warrants were among the Funds' top two monthly performers. However, Balboa never once mentioned the astonishing performances of either security in the "Commentary" section he authored for the Funds' newsletters for those months. Instead, in order to deflect investor attention from the Warrants' suspect valuations, Balboa misleadingly identified other investments as the Funds' "top performers" for April and June 2008, even though the Nigerian Warrants were actually the Funds' number one and two performers, respectively, for those two months.

**4.  Manipulation of Deloitte's 2007 Year-End Audit**

61.     Balboa also had De Charsonville and XYZ Corp. provide false 2007 year-end marks for the Nigerian Warrants to the Funds' outside auditor, Deloitte, in connection with its review of the Funds' 2007 year-end financials.

62.     Specifically, on or about April 11, 2008, at Balboa's direction, De Charsonville provided Deloitte with 2007 year-end marks of $370-470 for the Nigerian Warrants, even though the highest trading price for that time was $235. On or about June 12, 2008, at Balboa's direction, XYZ Corp. provided Deloitte with 2007 year-end marks of $525 for the same securities.

63.     Based on these two artificial marks, Deloitte proposed no adjustment to the Funds' 2007 year-end valuation of the Nigerian Warrants, which was more than double the securities' fair market value at the time, or 2007 year-end NAV. Deloitte later issued an unqualified opinion on the Funds' 2007 year-end financials, which was distributed to the Funds' prospective and current investors.

### C.  THE COLLAPSE OF THE FUND

64.     On October 16, 2008, in the wake of the credit crisis, the Funds' portfolio suffered nearly $1 billion in losses and was forced to file "winding up" petitions with the Supreme Court of Bermuda.  The Funds were subsequently placed under the control of three court-appointed joint provisional liquidators (the "Liquidators"), who continue to oversee the liquidation and distribution of the Funds' assets.

65.     As of today, the Funds' investors have not had any of their invested funds returned to them, and have been advised that no funds are ever likely to be returned to them.

### D.  BALBOA'S COVER-UP SCHEME

66.     Following the Funds' placement into liquidation proceedings in Bermuda, upon information and belief, Balboa launched a cover-up scheme in an attempt to prevent the Bermudian Liquidators from detecting his overvaluations of the Warrants. In furtherance of this scheme, Balboa persuaded two London-based brokers, both former coworkers, to falsely represent to MGIL that they had traded either the Nigerian or Uruguayan Warrants in 2008 at prices that were comparable to the Funds' recorded values for each of those securities.

67.     In the case of the Nigerian Warrants, Balboa provided one of the brokers with a letter containing a list of false pricing levels that reached as high as $3,725 and directed him to fax it to MGIL on his firm's letterhead as evidence of the prices quoted in 2008.  Neither the broker nor his firm had ever traded or made markets for the Nigerian Warrants.

68.    Similarly, Balboa directed another broker to send a series of emails to MGIL in which he falsely represented that his firm had traded the Uruguayan Warrants on three occasions between 2007 and 2008 at prices between $5.50 and $11 and inquiring if MGIL would be willing to sell any of its holdings of this security to one of his clients. Balboa drafted all of the correspondence with MGIL, including the email that contained the purported historical trading prices for the security by the firm. Neither the broker nor his firm had ever traded or made markets for the Uruguayan Warrants.

## E. DEFENDANTS' FINANCIAL GAINS FROM THE FRAUD

69.    Defendants profited from their fraudulent scheme. Balboa received approximately $6.5 million in compensation from MGIL that was tied to the performance and growth in assets under management of the Funds, both of which were substantially enhanced by the fraudulent overvaluation scheme.

70.    Balboa also rewarded De Charsonville and the broker at XYZ Corp. for their participation in the scheme through "kick-back" business from the Funds. As a result of Balboa having steered the Funds' trading business their way, the Funds became a top client for both De Charsonville and the XYZ Corp. broker at their firms. In particular, De Charsonville personally made approximately $443,000 in trading commissions from the trades that they arranged for the Funds. Moreover, in February 2008, shortly after XYZ Corp. broker began passing on Balboa's purported marks to GlobeOp, Balboa purchased approximately $35,000 in goods from a furniture store owned by the broker at XYZ Corp.

71.    Additionally, by inflating the Funds' value, Balboa maximized the assets under management by preventing investor redemptions, as well as raising new investor

funds based on the Funds' performance in tough markets. In fact, the Funds raised over $400 million in additional capital during the global credit crisis because of the manipulated performance figures.

## VI. RELIANCE

72.    Plaintiff, like all of the other investors in the Funds, justifiably relied on the representations in the offering documents when deciding to invest in the Funds. The disclosures and assumption that the pricing procedures would be honestly followed without any fraud were material to all investors, and thus reliance was by definition justifiable.

73.    Plaintiff relied on communications from the Funds after the date of purchase of its interests, including the reported NAVs, the monthly "Commentaries", and the 2007 audited financial statements, in deciding whether to continue to hold its investment. Because the Funds are not publicly traded companies, reliance on such communications as the Plaintiff's primary and even only source of information on the Funds is justifiable.

74.    Class Members are also presumed to have relied on communications from the Funds after the date of purchase of their interests, including the reported net asset values ("NAVs"), the monthly "Commentaries" and 2007 audited financial statements, in deciding whether to continue to hold their investments. Because the Funds are not publicly traded companies, reliance on such communications as the Class Members' primary source of information on the Funds is justifiable.

75.    In fact, Plaintiffs and Class Members rely solely upon the Funds' managers for the calculation of its NAV, performance and gains and losses on its assets.

The Funds' positions are not transparent, and Plaintiffs and Class Members have no means of independently verifying or evaluating the Funds' NAV, gains or losses reported to them. Plaintiffs and Class Members are captive to the Funds for this information.

## VII. DAMAGES AND LOSS CAUSATION

76.     At their peak, the Funds had approximately $844 million under management. Well over $400 million of these funds were raised during the time period of the fraudulent scheme. Through his fraud, Balboa falsely portrayed the value of the Funds as healthy and sound during a global credit crisis.

77.     Plaintiffs relied on these NAV calculations or signs of worsening in their decisions whether to continue holding or redeem their investments. Plaintiffs also relied on the NAVs and other "Commentaries" provided by the Funds for their own assessment of the Funds' health and prospective risks, including the risk that margin calls or leverage will wipe out the Funds.

78.     Balboa's fraud and the other wrongful conduct by Defendants misled Plaintiffs about the true financial health and risk of the Funds and induced them to hold. When the true risks associated with the worthless Warrants materialized, the Funds were wiped out by creditors before Plaintiffs and the Class ever had an opportunity to redeem their investments.

79.     As a direct result of the fraudulent and/or grossly negligent misrepresentations by Defendants of the value of the Funds, and the performance of its assets, Class Members have lost approximately $844 million, all of their investments in the Funds.

## VIII.   SPECIAL RELATIONSHIP BETWEEN DEFENDANTS AND INVESTORS

80.    Defendants had a special relationship with Plaintiffs and Class Members that gave rise to legally recognized duties of care and fiduciary duties.

81.    The Funds communicated directly and confidentially with each investor prior to the investment through offering documents including the Confidential Offering Memorandum provided to each investor. The offering documents contained disclosures about its pricing procedures. Through the offering documents, the Funds undertook responsibilities and duties for reporting its NAV and other information to investors that had no other source.

82.    The shares and limited partnership interests in the Funds are private securities, not traded on any public exchange, and can only be purchased by certain qualified investors. The Funds, and their managers, were obligated to truthfully and accurately report on NAV, asset values and the Funds' financial condition to investors.

83.    The Funds provided monthly performance summaries directly to the investors that were non-public in nature, and Balboa wrote "Commentaries" directly to investors, so as to keep them honestly and accurately informed.

84.    Defendants each participated in the Funds' execution of these duties and responsibilities, knowing that the valuations would be used to arrive and report on NAV, gains, losses and other commentary to investors and knowing that investors would rely upon the accuracy and honesty of the information provided.

85.    In the offering documents, the Funds also tout the extensive expertise and experience of the management team, and the high quality and reputation of the firms

providing services to the Funds. Biographies for no fewer than eight key employees are set forth in the offering documents. The offering documents also list the various third-party service providers including its auditors, legal counsel, custodian and valuation agent. The purpose this information is included in the offering documents is to engender confidence in the qualifications of the "team" of advisors assisting the Funds.

86.     Defendants were aware that the Plaintiffs and Class Members would use information provided by them for the special purpose of deciding whether to invest and/or redeem. Not only were Defendants the only conduit for information to get to the investors but the information was also not accessible from public sources or otherwise verifiable by the investors.

87.     Defendants and each and every member of the class are in direct contract through their subscription agreement, or indirect contract where they are third-party beneficiaries of another agreement between the Defendant and the Funds.

## IX.  TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATIONS

88.     Plaintiff, on behalf of the Class Members, did not discover the facts constituting Defendants' violations until December 2011, a date within the limitations periods governing this action, and promptly exercised due diligence by filing this complaint.

89.     Plaintiffs and Class Members could not reasonably have discovered Defendants' conduct before 2011, as the fraud was concealed, and therefore any applicable statutes of limitations were tolled until at least December 2011.

## X.  CLASS ACTION ALLEGATIONS

90.     Counts I through VII of this action assert class claims pursuant to Rules

23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased or otherwise acquired limited partnership interests in the Funds at any time, held during the period of false NAVs and valuations and suffered a loss. Excluded from the Class are Defendants and their respective officers, directors, employees, affiliates, legal representatives, predecessors, successors and assigns, and any entity in which any of them have a controlling interest or is a parent.

91.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time and can only be obtained through appropriate discovery, Plaintiff believes that the number of Class Members exceeds 180 and joinder would be impracticable. Record owners and other members of the Class may be identified from records maintained by Defendants and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

92.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. The questions of law and fact common to the Class include (1) whether Defendants falsified the Funds' NAV, valuations, gains and losses and, in doing so, violated duties in the offering memorandum; (2) whether Defendants  knowingly manipulated the Funds' valuations or performance to raise capital and/or forestall redemptions; (3) whether Defendants knew or recklessly disregarded that their statements were false or misleading; (4) whether Defendants breached fiduciary duties to the Class Members; and (5) the extent to which members of the Class have sustained damages and the proper measure of any such damages.

93.     Plaintiff's claims are typical of the claims of other Class Members, as all members of the Class were similarly affected by Defendants' wrongful conduct.

94.     Plaintiff is a substantial investor who will fairly and adequately protect the interests of Class Members and has retained counsel that is competent and experienced in class and securities litigation.   Plaintiff has no interests that are in conflict with or otherwise antagonistic to the interests of the other Class Members.

95.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. There will be no difficulty in management of this action as a class action.

## XI.  COUNTS

### COUNT I

**Negligent Misrepresentation Asserted Against All Defendants**

96.     Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein.

97.     Defendants had a special duty of care to investors that arose out of a special relationship.  Defendants, as a result of their special relationship with investors in the Funds, and their expertise and status in the financial industry, owed Plaintiffs and the Class duties of ordinary and reasonable care. Defendants' duties also arose to the relationship with the Funds, the Funds' managers and the investors, as well as their position and status with respect to the Funds.  Defendants owed duties of ordinary and reasonable care applicable to their conduct similar to the duties owed by any hedge fund, private equity firm or other investment advisor to its investors.

98.    Defendants made numerous false and misleading misrepresentations about the Funds, their valuations, their assets and/or their performance either directly or indirectly to Plaintiffs and Class Members concerning the Funds' true and accurate NAV, valuations, assets, gains or losses and/or financial condition and/or failed to take sufficient diligent action to ensure that such statements were not false or misleading.

99.    Defendants knew that the false and misleading representations were intended to go to the investors in the Funds, and that investors would rely on the representations as their only source for such information.    Defendants knew that investors would rely on such information in connection with decisions to invest, hold or redeem their investments, and knew that the statements would be material to such decisions.

100.    Defendants were grossly negligent in their failure to exercise reasonable care.    Defendants' conduct was an extreme departure from the ordinary standard of care and more than ordinary inadvertence or inattention.

101.    Plaintiffs and the Class justifiably relied on the statements issuing from Defendants.    Plaintiffs and the Class also justifiably relied on the ongoing statements Defendants made in deciding to continue holding and not redeem.

102.    As a result of Defendants' conduct, Plaintiffs and the members of the Class have suffered and continue to suffer economic and non-economic losses, in an amount to be determined according to proof at trial.

## COUNT II

### Negligence Asserted Against All Defendants

103.    Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein.

104.    Defendants had a duty of care to investors that arose from the contractual agreements they had and the representations made to investors in the offering documents and monthly communications sent to investors.  Defendants, as a result of their expertise and status in the financial industry, owed Plaintiffs and the Class duties of ordinary and reasonable care in exercising the duties and obligations they owed to investors and the Funds. Defendants' duties also arose to the relationship with the Funds, the Funds' managers and the investors, as well as their position and status with respect to the Funds. Defendants owed duties of ordinary and reasonable care applicable to their conduct similar to the duties owed by any hedge fund, private equity firm or other investment advisor to its investors.

105.    Defendants made numerous false and misleading misrepresentations about the Funds, their valuations, their assets and/or their performance either directly or indirectly to Plaintiffs and Class Members concerning the Funds' true and accurate NAV, valuations, assets, gains or losses and/or financial condition and/or failed to take sufficiently diligent action to ensure that such statements were not false or misleading.

106.    Defendants knew that the false and misleading representations were intended to go to the investors in the Funds, and that investors would rely on the representations as their only source for such information. Defendants knew that investors would rely on such information in connection with decisions to invest, hold or

31

redeem their investments, and knew that the statements would be material to such decisions.

107.    Defendants were grossly negligent in their failure to exercise reasonable care.  Defendants' conduct was an extreme departure from the ordinary standard of care and more than ordinary inadvertence or inattention.

108.    Plaintiffs and the Class justifiably relied on the statements issuing from Defendants.  Plaintiffs and the Class also justifiably relied on the ongoing statements Defendants made in deciding to continue holding and not redeem.

109.    As a result of Defendants' conduct, Plaintiffs and the members of the Class have suffered and continue to suffer economic and non-economic losses, in an amount to be determined according to proof at trial.

## COUNT III

### Breach of Contract Asserted Against Defendants MGIL, MGAL, and Balboa

110.    Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein.

111.    Plaintiff Marylebone purchased an investment in the Funds through a subscription agreement and a Confidential Offering Memorandum.

112.    Under the terms of Offering Memorandum, the Funds had an independent valuation agent and was supposed to use "independent sources" for valuations whenever practicable.  The Funds also utilized a valuation methodology which sought to establish "fair value" for illiquid and non-exchange traded investments through such factors as cost price and recent transaction prices.

113.    Defendants MGIL, MGAL and Balboa have contractual duties to comply with the terms and representations set forth and agreed to in Offering Memorandum which contained implied warranties of good faith and fair dealing.

114.    Defendants MGIL, MGAL and Balboa also breached the implied warranty of good faith and fair dealing because they made numerous false and misleading misrepresentations about the Funds to the Plaintiffs and the Class Members concerning the NAVs, valuations, the true source of the valuations and the fact that NAVs resulted from fraud.

115.    As a direct and proximate result of the contractual breaches, Plaintiffs and the members of the Class have suffered and continue to suffer economic and non-economic losses, in an amount to be determined according to proof at trial.

## COUNT IV

### Common Law Fraud Asserted Against All Defendants

116.    Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein.

117.    Defendants made numerous false representations to Plaintiffs and Class Members negligently, with reckless indifference to the truth, or with knowledge or belief that the representation was false, or Defendants deliberately concealed some material fact, or Defendants were silent in the face of a duty to provide disclosure to Plaintiffs and Class Members relating to the Funds' NAVS, valuation, assets, performance and financial condition.

118.    Defendants' false representations, concealment or silence induced Plaintiffs to invest in the Funds and/or forbear from redeeming their investments in the Funds.

119.    Plaintiffs and Class members justifiably relied upon Defendants' false representations, concealment or silence, which induced them to invest in the Funds and/or forbear from redeeming their investments in the Funds.

120.    As a direct and proximate result of such reliance, Plaintiffs and the members of the Class have suffered and continue to suffer economic and non-economic losses, in an amount to be determined according to proof at trial.

## COUNT V

## Unjust Enrichment Asserted Against Defendants MGIL, MGAL, and Balboa

121.    Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein.

122.    Defendants MGIL, MGAL, and Balboa paid themselves management fees that were calculated as a percentage of assets under management.

123.    Defendants MGIL, MGAL, and Balboa allocated a portion of profits to themselves (performance allocations) that were based on the increase in value of the assets under management.

124.    Defendants MGIL, MGAL, and Balboa knowingly provided grossly inflated asset values to the investors in all three Funds and calculated management fees and performance allocations based on the inflated assets values.

125.    Defendants MGIL, MGAL, and Balboa thus were able to extract larger management fees than they otherwise would have been entitled to.

34

126.    As a direct and proximate result of their own malfeasance, Defendants were unjustifiably enriched at the expense of the investors.

## COUNT VI

### Breach of Fiduciary Duty Asserted Against Defendants MGIL, MGAL, and Balboa

127.    Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein.

128.    Defendants MGIL, MGAL, and Balboa owed direct fiduciary duties to the Plaintiffs and Class Members. Specifically, these Defendants owed duties of candor and truthful disclosures and the duty to avoid disparate treatment of the investors.

129.    Defendants knowingly and/or grossly negligently made false statements in communications with the investors with respect to the value of the Funds, the assets held by the Funds, the financial condition of the Funds, and source of valuations.

130.    Defendants also failed to disclose to investors the true values of the Funds' assets and holdings, the true source of gains which offset losses, the true performance and the true financial condition.

131.    Defendants' actions constituted breaches of fiduciary duties owed directly to the investors.

132.    These breaches induced Plaintiff and Class Members to forbear from redeeming their investments in the Funds and as a result they incurred damages.

## COUNT VII

### Aiding and Abetting Breach of Fiduciary Duty Against Defendants GlobeOp, BCP, and XYZ Corp.

133.    Plaintiff incorporates by reference each and every allegation set forth above as though fully set forth herein.

35

134.    Defendants GlobeOp, BCP, and XYZ Corp. knew that the Funds and the Funds' managers had fiduciary duties towards the Plaintiffs and Class Members.

135.    Defendants GlobeOp, BCP, and XYZ Corp. knew that their false statements, acts and omissions aided and abetted breaches by the other Defendants of their fiduciary duties towards the Plaintiffs and Class Members, and that their false statements, acts and omissions substantially assisted the breaches by the other Defendants of the fiduciary duties owed towards Plaintiffs and the Class Members.

136.    Defendants GlobeOp, BCP, and XYZ Corp., with such knowledge that their false statements, acts and omissions aided and abetted breaches by the other Defendants of their fiduciary duties towards the Plaintiffs and Class Members, substantially assisted the breaches by the other Defendants of the fiduciary duties owed towards Plaintiffs and the Class Members,

137.    As a direct and proximate result of these breaches, the Offshore Funds have suffered and continue to suffer economic and non-economic losses, in an amount to be determined according to proof at trial.

## XII.   JURY DEMAND

138.    Plaintiffs demand trial by a jury on all triable issues.

## XIII.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and Class members pray for a judgment in their favor:

(1)    for an order determining that Counts I through VII of this action constitute a proper class action, and certifying the Class as defined herein and appointing Plaintiffs as class representatives and Plaintiffs' counsel as class counsel;

(2)    for compensatory, special and general damages according to proof;

36

(3)    for prejudgment interest;

(4)    for appropriate equitable relief;

(5)    for disgorgement of all management and performance fees paid by the Funds directly or indirectly to any Defendant;

(6)    for an accounting of all damages caused by Defendants to the funds and class members;

(7)    for reasonable attorneys' fees and costs of investigation and litigation; and

(8)    for such other and further relief as the interests of law or equity may require.

Dated:  May 14, 2012                            Respectfully submitted,

                                                **ZAMANSKY & ASSOCIATES LLC**

                                                By: _____
                                                Jacob H. Zamansky
                                                Edward H. Glenn, Jr.
                                                Kevin D. Galbraith
                                                50 Broadway, 32nd Floor
                                                New York, NY 10004
                                                Telephone: (212) 742-1414
                                                Facsimile: (212) 742-1177
                                                *jake@zamansky.com*

                                                **STEWARTS LAW US LLP**
                                                David A. Straite
                                                Ralph N. Sianni
                                                Michele S. Carino
                                                535 Fifth Avenue, 4th Floor
                                                New York, NY  10017
                                                Tel.: (212) 897-3731
                                                Fax: (212) 897-3733
                                                *dstraite@stewartslaw.com*

                                                ***Attorneys for Plaintiff***